[610 NYS2d 488]

BOARD OF TRUSTEES OF THE MUSEUM OF THE AMERICAN INDIAN, HEYE FOUNDATION, Respondent, v BOARD OF TRUSTEES OF THE HUNTINGTON FREE LIBRARY AND READING ROOM, Appellant.

First Department, April 14, 1994

### APPEARANCES OF COUNSEL

*Gideon Cashman* of counsel *(Tom J. Ferber* and *Myriamne N. Coffeen* with him on the brief; *Pryor, Cashman, Sherman & Flynn,* attorneys), for appellant.

*Richard A. Olderman* of counsel *(Anthony J. Steinmeyer* and *Lauryn Guttenplan Grant* with him on the brief; *Stuart M. Gerson, Assistant Attorney General,* and *Peter G. Powers,* attorneys), for respondent.

### OPINION OF THE COURT

MURPHY, P. J.

The Museum of the American Indian, Heye Foundation, until recently located at the intersection of 155th Street and Broadway in Manhattan, is a charitable trust established by George Gustave Heye in 1916. Since its inception the Museum has had as its mission advancing the anthropological study of the aboriginal peoples of the Americas, and towards that end has become the repository of a vast collection of Indian art and artifacts. In 1926, the Museum received from one James B. Ford a gift of $75,000 with which to purchase two libraries. The libraries, together including some 20,000 volumes as well as numerous periodicals, pamphlets and other materials relevant to the study of the aboriginal peoples of the Western Hemisphere, had been collected over the course of several decades by the noted anthropologists F.W. Hodge and Marshall H. Saville.

Soon after the Museum's purchase of the Hodge and Saville libraries, it became apparent that it lacked resources essential for their care and utilization; for want of more appropriate space, the libraries sat unused, and, for all intents and purposes, unusable, in the Museum's basement. In February of 1930, George Heye, then chairman of the Museum's Board, described the situation to the Museum's trustees in the following way: "[T]he library is at present temporarily housed in the basement of this [the Museum] building but is not being properly catalogued and is not receiving the necessary attention to make it available for use owing to lack of funds and to

lack of proper stack and reading room facilities." It was in this context, then, that Heye would welcome a proposal from a fellow museum trustee, one Archer M. Huntington, entailing an alternative but more useful disposition for the libraries.

Archer Huntington was the stepson of Collis P. Huntington, a founder of the Southern Pacific Railroad, who had settled in Westchester, and who in 1892, along with his wife Arabella D. Huntington, established on real estate abutting Westchester Square in what is now the Bronx but was then still part of Westchester, the Huntington Free Library and Reading Room. Pursuant to its foundation deed, the Library was formed as a charitable trust, the purpose of which was "to provide a place in Westchester, where all persons without distinction of race or creed may assemble for purposes of reading, study, education, and self-improvement, and for lectures, exhibitions, instruction and amusement." By 1930, Collis Huntington had passed away and Archer Huntington, "realizing that this reading room [the Huntington Free Library] was the only memorial to his illustrious father, in the East, and, desiring to expand its usefulness and importance",[1] perceived a way in which this might be accomplished while at the same time meeting the Museum's need of a library facility for the books in its basement. He thus proposed to George Heye, in his, Huntington's, capacity as trustee and president of the Huntington Free Library, that the Museum donate its entire book collection to the Library which would in exchange undertake at its own expense to house, catalogue and make available the donated materials, and to purchase appropriate accessions to the collection. In support of the contemplated transfer and the Library's undertaking in connection therewith, Huntington further proposed to donate land adjacent to the existing library structure on Westchester Square for the erection of a new four-story library building to house the Indian book collection, and to finance the construction of the new library facility with a gift of $150,000. He also proposed to enlarge the Library's general endowment by $100,000 and to establish with real estate then valued at $160,000 a trust, half the proceeds of which would be used to fund a separate endowment for the purchase of accessions to the Indian book collec-

---

1. This account of Archer Huntington's motives was given by George Heye at a meeting of the Museum's Board of Trustees held on February 4, 1930 and is reported in the trustee minutes from that meeting.

tion. Heye understandably welcomed Huntington's offer which he observed was "most desirable from the Museum's standpoint as it will assure for all time that the said Museum's library and all accretions thereto will be at all times available for use by the Museum, its members and its staff without further cost or expense to the Museum and because said Museum's library will be made properly and conveniently available to the public."[2] And, as the other members of the Museum's Board, after due consideration in consultation with the Museum's counsel, concurred in this assessment of the offer's desirability, the Museum trustees determined to go forward with the library transfer and did so on substantially the terms proposed by Archer Huntington. Accordingly, on May 27, 1930, a majority of the Museum trustees executed an Indenture, pursuant to which the Museum's library was transferred to the Huntington Free Library. The Indenture, after reciting in some detail the circumstances and consideration supporting the transfer, effects the conveyance using the following language:

"NOW, THEREFORE, to the end and for the purpose aforesaid, and in consideration of the premises and of the sum of Five Dollars, lawful money of the United States, to the Museum in hand paid by the Huntington Library, the receipt whereof is hereby acknowledged, the Board of Trustees of the Museum of the American Indian, Heye Foundation, do hereby assign, transfer and set over to the Trustees of the Huntington Free Library and Reading Room, as trustees under the Foundation Deed made by Collis P. Huntington and Arabella D. Huntington, dated August 15, 1892, hereinabove mentioned, all of the Museum's Library, consisting approximately of twenty thousand (20,000) volumes, and volumes subsequently acquired;

"TO HAVE AND TO HOLD unto said Trustees of the Huntington Free Library and Reading Room, and their successors, upon the trusts and for the uses and purposes designated in the said Foundation Deed made by Collis P. Huntington, and in trust further properly to house, stack, catalogue, care for and maintain the said Museum's Library so that the same shall be at all times in good order and condition and properly available for use and study by those who are interested in the study of

---

2. This statement concerning the desirability of the proposed transfer is found in the Supplemental Indenture to the Foundation Deed of the Museum of the American Indian executed by George Heye on May 27, 1930 (hereinafter Supplemental Indenture).

the anthropology of the aboriginal peoples of the Americas, and particularly the Members of the Museum and of the Staff thereof; under reasonable regulations made by the Library, to permit the Museum, its Members and the members of its Staff to have the privilege of withdrawing on loan and using at the Museum's own buildings such of the said books, periodicals, brochures and other pieces as the Museum, its Members, or the Members of the Staff thereof, may, under reasonable regulations, deem necessary or desirable for ready reference or for use in connection with the carrying out of the Museum's functions."

It is undisputed that the Library has, during the more than 60 years it has held the Indian book collection, scrupulously complied with the conditions upon which the collection was received: the books have been housed in a building constructed for that purpose and have been stacked, catalogued, maintained and made available to those interested in the study of the anthropology of the aboriginal peoples of the Americas. The collection has also been enlarged, primarily at the Library's expense, to approximately twice its original size. The Museum membership and staff over the years since the transfer have, accordingly, had uninterrupted access to a significantly augmented collection and have in addition been afforded the privilege of withdrawing items from the ordinarily noncirculating collection subject only to reasonable regulation by the Library. Thus, as George Heye envisioned, the Museum has enjoyed all the scholarly and curatorial advantages to be had from ready access to an important and well-maintained bibliographic resource without suffering any attendant financial detriment.

Notwithstanding its very beneficial arrangement with the Library, however, the Museum would come to find itself in increasingly difficult financial straits and eventually resolved that the only means of extricating itself therefrom and maintaining its viability as a cultural and scholarly institution would be to find some more advantageous location for its collections. Beginning in the latter 1970's then, the Museum earnestly sought a new venue, attempting first to relocate somewhere within New York State, and when no suitable location could be found in New York, to find an appropriate relocation site elsewhere. The Museum's search for a new home concluded in May 1989 when it entered into a Memorandum of Understanding with the Smithsonian Institution. That agreement and the subsequently enacted implementing

legislation[3] provide that the Museum's entire holdings are to be conveyed to the Smithsonian, within which will be established a National Museum of the American Indian to function as the institutional repository for the transferred collections. The National Museum of the American Indian is to have a primary exhibition facility situated on the Mall in Washington, D.C., and a research and storage facility located in Suitland, Maryland. New York City, however, is not to lose all nexus with the former Heye Foundation holdings as, pursuant to the implementing legislation and underlying agreement, some 82,500 square feet at the old United States Custom House in lower Manhattan has been allocated for use as a National Museum of the American Indian exhibition facility and some 2,000 square feet at the site of the Museum's original 155th Street location has been set aside for similar purposes.

The agreement between the Museum and the Smithsonian, it may be observed, reflects a conscientious effort by the parties thereto to devise a comprehensive and detailed dispositional plan for the Museum's holdings, one providing the Museum trustees the assurance necessary to the proper discharge of their fiduciary responsibilities, that the purposes of the Heye Foundation Trust, prominent among them that the Museum "promote the public welfare by actively advancing learning and providing means for encouraging and carrying on the beforementioned work within the State of New York," would be carried forward by its successor. Judicial approval of the transfer of the Heye Trust holdings to the Smithsonian, we note, was evidently based upon the Museum's showing that it had, in devising the new dispositional plan, endeavored to accommodate as well as it could, given the changed circumstances necessitating the transfer of the Museum's collections, all of the dominant purposes set forth in the Heye Foundation Trust.[4]

Apparently willing, at least in principle, that the Indian book collection should follow the Museum's artifacts to the Smithsonian, Edward A. Morgan, in his capacity as chairman of the Huntington Free Library's Board, in May 1989 commenced discussions with representatives of the Smithsonian

---

**3.** National Museum of the American Indian Act, 20 USC § 80q *et seq.*, added by Pub L 101-185, 103 US Stat 1336.

**4.** The transfer of the Heye Trust holdings to the Smithsonian was, of course, the subject of a separate cy pres proceeding, *Matter of Trustees of Museum of Am. Indian, Heye Found.* (index No. 25378/85).

with the object of reaching an agreement providing the Library trustees assurances similar to those furnished the Museum trustees in their then recently concluded Memorandum of Understanding with the Smithsonian. As is here relevant, Morgan proposed as a condition of the contemplated transfer that a significant facility for the Library occupying approximately 3,500 square feet be established at the aforementioned United States Custom House exhibition facility in Manhattan. Morgan also proposed that the remainder of the Library's holdings be housed in the new museum building to be situated on the Mall in Washington, D.C. These proposals were unacceptable to the Smithsonian which indicated that it did not wish to commit itself to any detailed dispositional plan for the Library.[5] Indeed, to the extent that the Smithsonian had any plan at all for the Library, it may be fairly inferred that it intended for it to be housed neither in New York City nor Washington, D.C., but at its research and storage facility in Suitland, Maryland, the Library having been characterized by Smithsonian Undersecretary Dean W. Anderson as "basically a research library designed for use by scholars and the MAI staff, and not by the general public".[6]

This action by the Board of Trustees of the Museum of the American Indian, Heye Foundation, against the Board of Trustees of the Huntington Free Library and Reading Room was commenced in January 1990. The complaint, although alleging no breach of any obligation assumed by the Library pursuant to the 1930 Transfer Indenture, asserts that the Library holds the Indian book collection " 'in trust' solely for the convenience and benefit of the Museum" and that in light of the Museum's decision to transfer its entire holdings to the Smithsonian, the Library may not equitably continue to retain possession of the book collection and related endowment funds. On the basis of this claimed inequity, the Museum

5. Dean W. Anderson, Undersecretary of the Smithsonian, states in his affidavit: "The Smithsonian rejected Mr. Morgan's second [transfer] proposal as well. Members of our staff explained to him on several occasions * * * that we are still in the early stages of planning for the National Museum and, as a result, are unwilling to agree now to detailed provisions regarding library location, program and space."

6. The Museum's preference for the Suitland facility is, in fact, clear from the complaint itself which states plaintively, "the defendant's conditions would require the main facility for housing the Museum's library be located in the National Museum's main exhibition facility on the Mall in Washington, D.C., rather than in its Maryland research and storage facility."

sought to have a constructive trust imposed upon the book collection and by this device to effect its "reacquisition" of the collection as a step preparatory to its transfer by the Museum, along with the Museum's other holdings, to the Smithsonian.[7]

In March 1990, barely three months following the commencement of the action, the Museum moved for summary judgment "imposing a constructive trust on Plaintiff's library and related endowment funds, and directing Defendant to convey Plaintiff's library and related endowment funds to Plaintiff." In June 1991, the IAS Court decided the motion in the Museum's favor, determining that the entire Indian book collection, including the books acquired by the Library subsequent to the 1930 transfer, should be reconveyed to the Museum. The court's decision, however, was not premised upon the constructive trust theory advanced by the plaintiff. Indeed, the court found that there was no legal ground for the imposition of a constructive trust since the Library, far from abusing a confidential relationship so as to enrich itself unjustly—the circumstance upon which the availability of a constructive trust remedy is ordinarily premised (see generally, Sharp v Kosmalski, 40 NY2d 119)—appeared to have discharged all of its obligations under the Transfer Indenture in "exemplary fashion". It was rather upon an express trust theory, which the court viewed as having been argued, if not pleaded, that the relief sought by the plaintiff was granted. In this connection, the court construed the aforecited language from 1930 Transfer Indenture to create an express trust the primary purpose of which was, according to the court, to benefit the Museum by affording its members and staff useful access to the Indian book collection. That purpose, the court found, could no longer be advanced and would in fact be thwarted by the Library's retention of the collection, since its retention of the books after the impending transfer of the Museum's entire collections to the Smithsonian would leave the books at too great a remove from the successor Museum's collections and staff. On this basis then, the court determined,

---

7. The Smithsonian, and not the institutionally moribund Museum of the American Indian, is, in fact, the real party in interest in this action. Although there would appear to be some question whether the Smithsonian, as successor-in-interest to the Museum, may assert a claim as a particular beneficiary under the Transfer Indenture, that is not an issue which has been pursued on appeal, nor is it one whose resolution is necessary to a proper appellate disposition.

purportedly pursuant to EPTL 7-2.2,[8] that the estate of the Library as trustee of the book collection for the Museum's benefit had ceased. In directing the reconveyance of the book collection to the Museum, the court apparently assumed that, upon the termination of a charitable trust, its corpus should revert to the grantor even where, as here, the grantor had made no provision for any reversionary interest in the dispositional instrument, and the disposition was one supported by very substantial consideration.

In dicta, the court expressed the view that the same result, i.e., the reconveyance of the Indian book collection, would follow under EPTL 8-1.1 (c) (1), New York's statutory articulation of cy pres and equitable deviation, which provides in relevant part: "whenever it appears to such court that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition, the court may * * * make an order or decree directing that such disposition be administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes, free from any specific restriction, limitation or direction contained therein". Explaining the applicability of this provision to the matter at bar, the court stated, "[H]ere, the identity of the intended charitable beneficiary of the book trust is certain; scholars, members and staff of the Museum or, in my view, its successor, the Smithsonian. Nor is there a problem of an inadequate fund. Rather, due to a change of circumstances not known or anticipated by either grantor or donee, compliance with the administrative provision of having the library maintained by the HFL in the Bronx for the benefit of the museum is impracticable. The purpose of the trust has not been defeated or impaired, but will be substantially strengthened by transferring the administration of the library to the Museum, and from it to its successor, the Smithsonian."

On October 3, 1991 a judgment was entered upon the above-described decision. Pursuant to the judgment, the complaint was deemed amended to seek a declaration that the 1930 Transfer Indenture created an express trust the primary purpose of which had ceased, and that defendant's estate as

---

8. EPTL 7-2.2 provides in its entirety, "[w]hen the purpose for which an express trust is created ceases, the estate of the trustee also ceases."

trustee had, therefore, terminated in accordance with the dictate of EPTL 7-2.2. The complaint having been amended to state the claim upon which the court believed the requested relief could and should be afforded, the judgment went on to direct that the entire Indian book collection be transferred to the Museum. This appeal by the defendant Library followed.

Responding to the theory upon which the motion court based its determination, defendant argues at some length that no trust was created by the 1930 Transfer Indenture, and that even if a trust was created its purposes had not ceased so as to warrant termination pursuant to EPTL 7-2.2. As for the plaintiff Museum, its appellate stance, too, is defined in response to the motion court's trust termination theory; for whereas the plaintiff had in the first instance argued that the return of the Indian book collection ought to be compelled by reason of a still valid purpose and corresponding equity arising out of the Indenture, its principal contention now is that the dominant dispositional purposes have definitively ceased and that the disposition ought therefore to terminate in accordance with EPTL 7-2.2.

■ In deciding whether plaintiff is entitled to the relief it has requested, namely, the immediate and unconditional return of the book collection, we need not adjudicate whether the Indenture did in fact create an express trust. Nor do we need to decide whether, assuming its creation, such a trust terminated for failure of purpose. For, even if there was a trust, and it failed, it is clear that, contrary to the motion court's assumption, the consequence of such failure would not be the return of the trust corpus to the plaintiff.

It is important to note at the outset that whether or not the disposition effected pursuant to the 1930 Indenture was an express trust, it was indisputably a disposition of property for charitable purposes.[9] Courts, of course, have been reluctant to countenance the termination of charitable dispositions, and the law, in any case, requires that such dispositions be saved when there exists a means by which a grantor's general intendment, if there is one, might yet be realized (see, EPTL 8-1.1 [c]). Thus, when it appears that a particular purpose for which a charitable disposition has been made has ceased, or that there is some other impediment rendering literal compli-

---

**9.** A disposition of property for charitable purposes need not be in the form of a trust; it can also be in the form of an absolute transfer subject to conditions (see, e.g., Matter of Carper, 67 AD2d 333, 337, affd 50 NY2d 974).

ance with the terms of the disposition impossible or impracticable, the proper course is not the summary termination of the disposition, as might be appropriate in the case of a noncharitable disposition subject to the unmediated application of the rules set forth in EPTL article 7, but an inquiry pursuant to EPTL 8-1.1 (c), New York's statutory articulation of cy pres and equitable deviation, to ascertain whether any general purpose of the disposition still admits of achievement by some alteration in the administration or application of the disposition; and, if, in the judgment of a court having jurisdiction over the disposition such a modification can be made, the court is empowered to "make an order or decree directing that such disposition be administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes" (EPTL 8-1.1 [c] [1]).

As can be seen, the statute is specifically designed to prevent the failure of a charitable disposition while there remains a general purpose of the disposition possible of accomplishment. In entertaining the assumption, then, that the charitable disposition here at issue has terminated by reason of the cessation of its purposes, it follows that we must also assume that there is absolutely no significant dispositional purpose, particular or general, which might yet be achieved by means of cy pres or equitable deviation.

The problem now to be addressed is this: if the purposes of the supposed trust have so completely and utterly ceased as to require its termination, on what basis would plaintiff lay claim to the former trust assets? Certainly, it could not be that the return of the trust corpus is necessary to advance some purpose of the trust, for the trust purposes have, by hypothesis, ceased. Indeed, it should be stressed that the finding necessary to terminate a charitable trust pursuant to EPTL 7-2.2 cannot be simply that there is some practical obstacle to the achievement of still valid dispositional purposes—for that is a circumstance to be dealt with, if at all, under the rubric of cy pres—but rather that the purposes themselves have ceased. And, as noted, if the dispositional purposes have, in fact, ceased, no one, including of course the plaintiff, may claim any further beneficial interest in measures aimed at their attainment.

Nor does there appear any other basis, legal or equitable, upon which the return of the corpus of the hypothetically terminated trust could be compelled. Plainly, the Indenture itself makes no provision for reversion to the grantor, and

absent such a provision in a charitable disposition it is generally the case that none will be implied *(see, e.g., Matter of Hendricks,* 1 Misc 2d 904, 912, *affd* 3 AD2d 890, *affd* 4 NY2d 744; *Matter of Faxton,* 18 Misc 2d 192, 197; *see generally,* 18 NY Jur 2d, Charities, § 66). And, although the general reluctance to imply a reversion into a charitable disposition is sometimes overcome when the terminated disposition was at its inception the result of a gratuitous donation—there being no reason in such a situation to suppose that some other disposition of the failed trust's corpus would have been intended—the disposition at bar was anything but gratuitously created. Indeed, the transfer of the Indian book collection to the Huntington Free Library was induced and supported by extremely valuable consideration. As noted, and as is in any case clear from the face of the Indenture, the transfer was made upon the Library's commitment to perform various undertakings to assure that the book collection would "at all times" be properly housed, maintained, enlarged and, of course, made available for use. Each of these undertakings involved what, at the time of the disposition, just one year after the financial collapse of 1929, was an enormous expenditure or, as the case may be, allocation of resources. The costs of the new library facility alone were significantly greater than the market value of the books it was designed to accommodate. And, to this initial outlay was added the Library's commitment to set aside very substantial amounts of capital to assure that the book collection would, to use George Heye's expression, "for all time" (Supplemental Indenture [n 2, *supra]),* be appropriately cared for, made available for use and augmented. Plainly, these extremely costly undertakings entailing the long-term dedication of Library resources, were indicative of what both the Library and the Museum must have understood to be a permanent arrangement. It is simply not consistent with this arrangement and what all concerned must have known it to entail on the part of the Library, to imply into the Transfer Indenture a reversion in the Museum's favor, particularly, as is here implicitly claimed, one to be invoked upon nothing more than the unilateral decision of the Museum to transfer its holdings to some more distant place. As has been observed, "[I]f consideration is paid by the trustee or another for the transfer in trust, and the trust fails, the trustee retains the property as his own, and no trust results to the settlor, since he has received the value of the property and would be unjustly enriched as against the

trustee if allowed to keep the consideration and get back the property. He cannot reasonably be said to have intended a return of the property, after having been paid its value, if the trust failed. He must be deemed to have intended that the trustee retain the property as his own" (Bogert, Trusts § 75, at 282-283 [6th ed]). By reason of the consideration initially supporting the transfer and the Library's subsequent diligence in executing its obligations under the Transfer Indenture, the Museum has for over 60 years enjoyed virtually unfettered access to a unique bibliographic resource without bearing any of the considerable attendant costs.[10] The Museum in the truest sense has during the period since the transfer received the "value" of the book collection entirely at the expense of the Library, and in this context particularly, cannot assert any equitable claim to the "reacquisition" of the collection upon the hypothetical cessation of the trust purposes and therefore of the trust itself. This is especially true when much of the collection it would "reacquire"—that portion of the posttransfer accessions purchased with Library funds—was never acquired by it in the first place.

■ In view of the foregoing, it is hardly surprising that the Museum did not originally seek the return of the book collection on the theory that reconveyance would follow as a consequence of trust termination pursuant to EPTL 7-2.2. Indeed, as may seem ironic in light of the subsequent course of this litigation in which the Museum has come to embrace the motion court's trust termination theory wholeheartedly, it is only by reason of that purpose of the 1930 disposition running particularly in the Museum's favor, the continued validity of which is a circumstance fundamentally incompatible with dispositional termination pursuant to EPTL 7-2.2 (particularly when that purpose is viewed, as it has been by both the plaintiff and the motion court, as the sole significant purpose of the disposition), that the Museum may have any claim at all upon the Indian book collection. It must then be counted fortunate for the Museum that contrary to its appellate arguments and the motion court's finding, the purposes of the 1930 disposition have quite evidently not ceased. Indeed, the motion court's purportedly dispositive finding that there had been such a failure of purpose simply cannot be recon-

---

**10.** The defendant estimates that some $24 million has been spent on the maintenance and enlargement of the collection. While the estimate has not been verified, it is clear that very substantial amounts have been expended.

ciled with its subsequent and we think, manifestly more accurate observation that "[t]he purpose of the trust has not been defeated or impaired".

The persistence of the dispositional purposes is, however, not a matter about which it is necessary to expound at length, for given our conclusion that the book collection would not result back to the Museum even in the event of dispositional termination pursuant to EPTL 7-2.2, it would hardly improve plaintiff's prospects of recovering the book collection were we to conclude, as the plaintiff has urged, that there had been a cessation of dispositional purposes. Indeed, in light of our rejection of the motion court's trust termination theory as a means of affording plaintiff the relief it has sought, plaintiff would presumably have us proceed on the basis of its original, diametrically different contention, which, reduced to its essentials, is that the vindication of its continuing interest as a beneficiary of the 1930 disposition requires the reconveyance of the book collection.[11]

■ Preliminarily, we should express our agreement with the motion court that the imposition of a constructive trust is not an appropriate means of enforcing whatever beneficial interest plaintiff retained under the 1930 Indenture. This is not a case where the custodian of the sought assets has obtained or retained possession wrongfully. To the contrary, the defendant's possession of the book collection has at all times been pursuant to the terms of the Transfer Indenture. Plainly, there is nothing in the Indenture which might be construed as a promise by the defendant to surrender custody of the books at any time or upon the happening of any event, and equally plain, especially in light of the substantial consideration furnished in support of the 1930 transfer as well as defendant's subsequent expenditures to maintain and augment the collection, the defendant's retention of the books could not possibly furnish grounds for a claim against it of unjust enrichment. As this is not a case involving misappropriation or unjust enrichment, there can be no occasion for impressing a trust; there quite simply has been no wrong, much less one which that device might rectify. The problem in this case, if any, is not that plaintiff has been deprived of possessing what is rightfully its own, but that the enjoyment of whatever equita-

---

11. The plaintiff has, in fact, requested that we consider its constructive trust theory and cy pres as alternate means of affording it the relief it seeks.

ble interest it may have retained under the 1930 Indenture may be compromised by an eventuality which in its specific manifestation was unanticipated at the time of the Indenture's making. The issue is, remedially speaking, quite simply, what, if any, variance must be made from the literal terms of the disposition to afford plaintiff the full benefit it was intended to receive thereunder. This is a matter plainly to be resolved within the context of the aforecited cy pres statute.

▪ A court having jurisdiction over a charitable disposition may, of course, invoke the cy pres power to alter the disposition on its own initiative *(Sherman v Richmond Hose Co. No. 2*, 230 NY 462, 473), but only upon facts establishing "that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition" (EPTL 8-1.1 [c] [1]; *Matter of Wilson,* 59 NY2d 461, 472). Although it is undeniable that circumstances have changed since the 1930 disposition, and that they have changed in a way which the parties to the Indenture could not have anticipated in its particulars, it is by no means equally evident that the changed circumstances have rendered literal compliance with the dispositional terms impracticable.

The relevant change in circumstances for present purposes is the Museum's transfer of its collections and staff to the Smithsonian. Of the dispositional purposes set forth in the 1930 Indenture, there is only one whose achievement this change might, even arguably, affect. That, of course, is the dispositional objective of making the book collection "properly available for use and study by those who are interested in the study of the anthropology of the aboriginal peoples of the Americas, *and particularly the Members of the Museum and the Staff thereof"* (emphasis added). While it is doubtless true that subsequent to the move of the Museum's staff to the Smithsonian, it will no longer be as convenient as it had been for them to visit the Huntington Free Library, we do not think that this circumstance alone renders the achievement of the subject dispositional purpose "impracticable". The Library and its collection will continue to be available to the Museum staff notwithstanding the latter's relocation, just as, pursuant to the Indenture, they are, and always have been available to other interested parties, many of whom have hailed from places and institutions far more distant than the Smithsonian. It should be recalled that the Indenture requires only that the

books be made "properly available for use and study"; and, as is clear from its context, the concept of "proper availability" does not entail that the book collection be housed within any particular degree of geographical proximity to its users. All that was contemplated—indeed, all that could have reasonably been contemplated given the diverse provenance of prospective users—was that the Library would do all that was necessary to facilitate the use of the books by those who wished to visit its premises for that purpose. Travel in pursuit of farflung source material[12] is, after all, a most common incident of serious scholarship and we do not think it could be realistically maintained that the necessity of an occasional trip by Museum personnel to use the book collection, even from as far away as Washington, D.C., or Maryland, would in any way impair, much less render impracticable, the collection's "proper availability". It must, in any event, be thought that those occasions when the nature of the research to be performed would require the presence of Museum personnel at the Huntington Free Library would be relatively rare, for not only has the Museum staff's over-all use of the Library apparently been far from frequent,[13] but there exist highly practicable alternatives to actual visitation of the Library premises. In an age of unparalleled technological advances in the management and dissemination of information, there is undoubtedly the capacity to conduct much research involving once remote sources by readily accessible electronic means.[14]

It is, of course, true that the Indenture requires that the Indian book collection be made available particularly to Museum members and staff, but the way in which the Indenture assures the particular availability of the collection is, notably, not by requiring that it always be located near the Museum, something which the parties to the transfer must have under-

12. Here it may be noted that the Huntington Free Library is but one of three major libraries dedicated to American Indian anthropology, the others being the Newberry Library in Chicago and the library of the Peabody Museum in Boston.

13. The record indicates that the Library has in recent years received visits from approximately 400 researchers per year. Of these, it would appear that the greater number have no affiliation with the Museum. From this it is fair to infer that the frequency of Museum staff visits to the Library has not been great even when the Library was relatively close to the Museum.

14. The record, in fact, indicates that the Library has in recent years more frequently responded to inquiries from afar than it has entertained researchers on its premises.

stood could not be assured "for all time", but by affording "the Museum, its Members and the members of its Staff * * * the privilege of withdrawing on loan and using at the Museum's own buildings such of the said books, periodicals, brochures and other pieces as the Museum, its Members, or the Members of the Staff thereof, may, under reasonable regulations, deem necessary or desirable for ready reference or for use in connection with the carrying out of the Museum's functions." This uniquely conferred privilege must be viewed as having been provided in the Indenture precisely to compensate for the circumstance that, as a result of the 1930 transfer, the book collection would be situated in an institution geographically and indeed, institutionally, distinct from the Museum. Given today's dramatically heightened capacity for the rapid conveyance of objects and information, there appears no reason why, even with the move of the Museum's collections and staff the additional distance to the Smithsonian, the subject privilege cannot continue to be enjoyed with a compensatory effect at least the equal of that originally contemplated under the Indenture.

It may, of course, be, as the plaintiff urges, that the Smithsonian would be able to provide a better, more sophisticated and, so far as its staff are concerned, more convenient library facility than has hitherto been provided by the Huntington Free Library. But, in deciding whether this is an appropriate case for the use of the cy pres power, the inquiry framed by the statute is not whether there is some other agency which might discharge the dispositional purposes in even more exemplary fashion, but whether it is "impracticable or impossible" for the particular agency charged with the obligation of administering the disposition to continue to do so. Cy pres does not authorize judicial alteration of a charitable disposition simply because there may be some even more efficacious way of achieving the dispositional purposes. The unsettling effect of such a promiscuous resort to the cy pres power can hardly be overstated; courts would be constantly involved in the redeployment of charitable assets, sanctioning their transfer from institution to institution upon the merest showing that the assets might be more usefully situated. Cy pres is not a means for the comprehensive rearrangement of charitable holdings, but only of those holdings whose use in accordance with the literal terms of a governing disposition has become "impracticable or impossible".

Consideration of the relative efficacy of alternative disposi-

tional plans is appropriate only after the threshold finding of impracticability or impossibility has been made and then only within the limitations prescribed by the statute. Cy pres may not be employed simply to promote what the court views as a worthy charitable agenda; it is rather a power whose permissible use is confined to the perpetuation and advancement, to the extent possible, of the particular dispositional agenda prescribed in the dispositional instrument (see, EPTL 8-1.1 [c]; *Matter of Scott,* 8 NY2d 419, 426-427; *Matter of Wilson, supra,* at 472). Thus, while a court in the exercise of the cy pres power may disregard specifically prescribed restrictions, limitations or directions respecting the way in the which the dispositional purposes are to be achieved (EPTL 8-1.1 [c]), it may do so only insofar as such variance facilitates or is at least compatible with the realization of the full dispositional design; it may not do so where the result would be a dilution of any significant and practicable dispositional purpose. As was noted in *Matter of Scott (supra,* at 426), "[i]n a cy pres proceeding the way may be open to more than one practical substitute for a direction by a testator which can no longer be executed, but the circumstance that there may be more than one alternative in deciding what disposition most nearly resembles that which was made by the testator does not preclude a question of law from arising concerning whether the Surrogate [or, as here, the Supreme Court] has exceeded his powers by overriding or failing to give effect to basic purposes of the testator [or, as here, the grantor] as expressed in the instrument". Just such a question would arise if the cy pres power were to be employed in the present case to obtain the result the plaintiff seeks; for even if, contrary to our dispositive finding, there were grounds justifying its use, it is extremely doubtful that a legally sustainable exercise of the cy pres power would result in the immediate and unconditional return of the dispositional corpus to the plaintiff.

While the plaintiff and the motion court have expressed the view that there is but one dominant purpose of the subject disposition, namely, rendering the Indian book collection available for use, and particularly for use by the Museum staff, that is not a view supportable either by reference to the Indenture or the undisputed circumstances attendant upon its making (see, *Matter of Scott, supra,* at 426). The 1930 transfer of the Indian book collection did not come to pass simply by reason of the Museum's need of a library facility. While Archer Huntington was doubtless sympathetic to that need,

that alone would not have been a sufficient basis upon which to propose the commitment of Library resources in perpetuity for the collection's housing, upkeep and enlargement. Indeed, had Huntington wished simply to confer a benefit upon the Museum, it is plain that he was capable of doing so directly. Rather, it was Huntington's evident intention that both the donor and donee institutions would benefit from the transfer: the Museum would of course obtain the use of the books in its basement and the Library would, as custodian of the book collection, add to its own usefulness and importance as a cultural and scholarly resource and, in so doing, make a more fitting memorial to Huntington's illustrious father. These motivations were certainly well understood by George Heye who expressly disclosed them to his fellow Museum trustees at the February 4, 1930 meeting of the Museum Board in the course of which the transfer proposal was formally placed before them.

Huntington's proposal, of course, eventually became the basis for the transfer, the terms of which, as embodied in the Transfer Indenture, differed little from those initially proposed. It is not surprising then that first among the purposes of the transfer set forth in the Indenture was that the books be held by the Library trustees and their successors "upon the trusts and for the uses and purposes designated in the said Foundation Deed made by Collis P. Huntington". Contrary to the motion court's view, this directive cannot be viewed simply as an administrative provision negligible in a proper exercise of the cy pres power. It would appear indisputable that the transfer was proposed, made, and accepted, at least in significant part, to advance the charitable and institutional purposes of the Huntington Free Library and that the aforecited direction was included in the Transfer Indenture precisely to insure that those purposes would be accorded a position of some prominence in the over-all dispositional design. Plainly, the cy pres power would not be permissibly used to dilute those purposes much less to dispense with them completely.

This is especially true since there is, on the present record, no reason to suppose that it would be impracticable to devise an alternate dispositional plan giving appropriate weight to the Library's interests in the context of the disposition as a whole. The Museum, it may be noted, in order to accommodate within its own alternative dispositional plan that provision of the Heye Trust requiring that it "promote the public

welfare by actively advancing learning and providing means for encouraging and carrying on the beforementioned work within the State of New York," has arranged to retain a very substantial presence for its collections and presumably its staff within New York. Given this circumstance in particular, the provision of a similar, albeit smaller-scale New York presence for the Indian book collection, which would at once satisfy the Transfer Indenture's direction that the books be used to advance the purposes of the Library Trust—among them the provision of "a place in New York" for the pursuit of educational and cultural activities—and the Museum's desire for a more closely situated library facility, would appear, at the very least not infeasible. This was, in essence, what was proposed by Library chairman Edward Morgan. His proposal, however, was rejected out of hand, not because it was impracticable, but because the Smithsonian did not wish to commit itself to any detailed plan of disposition for the books. Yet, as noted, it is not within the cy pres power simply to release dispositional assets from the constraints of a dispositional design; indeed, it is the very essence of cy pres that any deviation from the original dispositional plan be pursuant to an alternate plan of disposition sufficiently detailed to provide the necessary assurance that the original dispositional design will be, to the extent practicable, effectively carried forward.

It is, of course, true that the disposition of the Indian book collection pursuant to the alternate plan of disposition devised for the Heye Trust assets would, most likely, effectively promote some of the purposes recited in the 1930 Transfer Indenture, but that does not alter the fact that the 1930 transfer was a separate disposition governed by a separate dispositional instrument reciting purposes and reflecting motives which were not in all material respects identical to those accommodated within the cy pres proceeding relating to the Heye Trust. If, then, cy pres was to have been employed, it should have been toward the end of formulating a separate dispositional alternative giving appropriate weight to each of the basic elements in the subject disposition's unique design; contrary to the motion court's apparent view, the unconditional reconveyance of the book collection, negating, as it would entirely, that provision of the Indenture pursuant to which the book collection was evidently intended to be used to expand the Library's usefulness and importance both as a cultural resource and as a memorial to its founder, would not have been the functional equivalent of cy pres. Indeed, the

Court of Appeals has spoken with particular cogency as to the relevance of purposes of the last sort to the proper use of the cy pres power: "Nor was it a 'selfish' purpose, inconsistent with cy pres, to desire to perpetuate conspicuously the name and memory of the donor as a benefactor of the church and humankind. * * * These desires are deeply ingrained in human nature and are effective motivating forces in donations of this character. Cy pres is not designed to nullify them, where, as here, it is practicable to encompass them in the decree" *(Matter of Scott, supra,* at 427-428).

Concluding as we do that the reconveyance of the Indian book collection cannot be compelled either as a consequence of trust termination or as a measure necessary to the vindication of any beneficial interest retained by the plaintiff in the Transfer Indenture, it is our view that the complaint must be dismissed. While there may exist perfectly sound reasons of a curatorial, scholarly, aesthetic or other sort, why it would be desirable for the Indian book collection to find a home in an institution as eminent as the Smithsonian, we are not free to move charitable assets from one institution to the next simply to maximize the utility of those assets in some broad sense. What the law recognizes in its imposition of far more stringent, dispositionally based conditions on the use of the cy pres power, is that the consequence of so easily dispensing with a grantor's directions would be to discourage charitable giving and to rob charitable institutions of the stability necessary to the discharge of their purposes. Doubtless it is better in the end for society to reap the benefit of charitable giving even in the form of dispositions imperfectly suited to the achievement of their purposes, than to forego the benefits of charity altogether in the course of pursuing by judicial means some almost certainly elusive ideal reallocation of charitable resources. In any case, nothing which has been said should be taken as requiring that the Indian book collection remain at its present location in perpetuity. While there has been no showing in this proceeding which might suffice as a predicate for the invocation of the cy pres power, that in no way forecloses the possibility that cy pres might, in response to circumstances not documented on the present record, at some point be appropriately employed to alter the disposition at issue. Moreover, there is nothing to prevent all those beneficially interested in the subject disposition, a class which would include, in addition to the Museum and its alleged successor-in-interest, the Smithsonian, the Huntington Free Library and the people of New York as represented by the State Attorney-

General,[15] from consenting to the alteration of the disposition on mutually agreeable terms *(see,* EPTL 7-1.9).

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Martin B. Stecher, J.), entered October 3, 1991, which deemed the complaint amended to demand a declaration that the 1930 Indenture created an express trust which had terminated pursuant to EPTL 7-2.2; and which granted the plaintiff's motion for summary judgment on the basis of the complaint as amended, declaring that the subject Indenture created an express trust whose purposes had ceased, terminating the estate of the defendant as trustee pursuant to EPTL 7-2.2; and which upon such declaration directed that the book collection held by the defendant pursuant to said Indenture be reconveyed to the plaintiff; should be reversed, on the law, and upon a search of the record summary judgment should be granted to the defendant denying the sought declaration for the aforestated reasons and dismissing the complaint, without costs.

CARRO, ROSENBERGER, ROSS and ASCH, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered October 3, 1991, reversed, on the law, without costs, and upon a search of the record, summary judgment granted to defendant denying the sought declaration for the reasons stated in the opinion, and the complaint dismissed.

---

**15.** The Attorney-General, although notified of the present proceeding, elected not to participate.