IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 28, 2011 Session

## IN RE FISK UNIVERSITY

**Appeal from the Chancery Court for Davidson County
No. 052994III    Ellen H. Lyle, Chancellor**

**No. M2010-02615-COA-R3-CV - Filed November 29, 2011**

After finding that *cy pres* relief was available to modify conditions imposed by donor of artwork which had been gifted to Fisk University, the trial court approved agreements whereby the Crystal Bridges Museum would purchase a fifty percent interest in the art for $30 million and would thereafter share in the display and maintenance of the artwork. The court conditioned approval of the agreements on the requirement that Fisk establish an endowment of $20 million from the proceeds of sale in furtherance of the donor's intent to make the art available for the citizens of Nashville. The Attorney General of Tennessee appeals, contending that the trial court exceeded the scope of remand and that the court erred in determining that the agreement with the Crystal Bridges Museum most closely reflects the donor's intent. Fisk seeks review of trial court's requirement that it establish the endowment. We affirm the trial court's decision in part, reverse in part, and remand for further proceedings.

**Tenn R. App. P. 3; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., joined. FRANK G. CLEMENT, JR., J., filed a separate opinion concurring in part and dissenting in part.

John P. Branham, Stacey A. Garrett, C. David Briley, and C. Michael Norton, Nashville, Tennessee, for the Appellant, Fisk University.

Robert E. Cooper, Jr., Attorney General and Reporter, Joseph F. Whalen, Associate Solicitor General, Janet M. Kleinfelter, Deputy Attorney General, and William N. Helou, Nashville, Tennessee, for the Appellee, State of Tennessee.

Thor Y. Urness, Nashville, Tennessee, for the *Amici Curiae*, Task Force for the Rescue and Restoration of Fisk University.

## OPINION

### FACTS AND PROCEDURAL HISTORY

This case comes before this Court for a second time and concerns the continuation of efforts by Fisk University to modify, under the doctrine of *cy pres*, certain conditions attendant to a gift of works of art, known as the Steiglitz Collection ("the Collection"), given to Fisk by modernist painter Georgia O'Keeffe.[1]  In the earlier appeal, we reversed the trial court's dismissal of the petition for *cy pres* relief and remanded the case for a determination on its merits.  A thorough discussion of the nature of the proceeding and the factual background leading to the filing of the *cy pres* petition is found in *Georgia O'Keeffe Foundation (Museum) v. Fisk University*, 312 S.W.3d 1 (Tenn. Ct. App. 2009).  We remanded the case as follows:

> It is premature to determine what *cy pres* relief, if any, the University may be entitled to receive based on the unique facts of this case because the University has not established all three prongs of the New York *cy pres* analysis.  At this stage of the proceedings, the University has not established whether the change of circumstances subsequent to the gift render literal compliance with the conditions impossible or impracticable.
>
> Accordingly, a determination of whether any form of *cy pres* relief is available must be held in abeyance unless and until the trial court, on remand, finds that literal compliance with the conditions imposed by Ms. O'Keeffe are impossible or impracticable.  If *cy pres* relief is available to the University, then the trial court is to fashion a form of relief that most closely approximates Ms. O'Keeffe's charitable intent.

*Georgia O'Keeffe Foundation (Museum)*, 312 S.W.3d at 19–20 (citations omitted).

A trial was held, and on August 20, 2010, the court entered a Memorandum and Order holding that Fisk's financial situation rendered strict compliance with the conditions impracticable and, as a consequence, *cy pres* relief was available.  The court further held that Fisk had not demonstrated that the proposed agreement with the Crystal Bridges Museum in

---

[1]  The Collection is comprised of ninety-seven pieces from the Alfred Stieglitz estate and four paintings from Ms. O'Keeffe's personal collection.

Bentonville, Arkansas, for which it sought approval, closely approximated Ms. O'Keeffe's intent; the court found that eight provisions of the agreement overrode, thwarted, and diluted Ms. O'Keeffe's purpose for making the gift. Finding deficiencies with Fisk's initial proposal, the court invited the parties to submit additional proposals addressing the display and maintenance of the Collection.

In response to the court's request, the Attorney General filed a proposal which provided for the creation of a public and private partnership between the State of Tennessee, the Frist Center for the Visual Arts,[2] and the Metropolitan Government of Nashville and Davidson County, in which the partnership would take temporary control of the Collection until Fisk had the financial ability to resume its role as custodian of the Collection. By Order entered September 14, 2010, the court rejected the Attorney General's proposal due in part to the fact that the proposal did not provide a long-term solution for the Collection.

On October 8, 2010, Fisk submitted an Amended and Restated Joint Ownership Agreement and an Amended and Restated Purchase and Sale Agreement (collectively referred to as the "Revised Sharing Agreement")[3] with the Crystal Bridges Museum. On October 22, 2010, the Attorney General submitted a second proposal seeking court approval of an endowment fund to be established by Fisk alumna Carol Creswell-Betsch at The Community Foundation of Middle Tennessee with the purpose to "benefit, in perpetuity, the display and care of the Alfred Stieglitz Collection at the Van Vechten Gallery at Fisk University."[4]

---

[2] The Affidavit of William R. Frist, Chairman and President of the Board of Trustees of the Frist Center for the Visual Arts ("the Frist"), filed as part of the Attorney General's proposal, states:

> The [Frist] was chartered as a public benefit corporation under the Tennessee Nonprofit Corporation Act on March 3, 1998. It opened in April 2001, with a vision "to inspire people through art to look at their world in new ways." The Mission of the [Frist] is "to present and originate high quality exhibitions and related educational programs and community outreach activities." The attendance at the [Frist] averages 200,000 visitors per year.

[3] The trial court referred to these agreements collectively as the "Revised Sharing Agreement" and we adopt that designation in this opinion.

[4] The affidavit of Ellen Lehman, president of The Community Foundation, stated that the Foundation was established to "serve as a leader, catalyst, and resource for philanthropy" and that it "does this by connecting civic minded individuals, with an interest in philanthropy, with worthy charities." The fund established by Ms. Creswell-Betsch would be funded by individuals, organizations, and corporations and was conditioned on entry of an order in this proceeding approving the Creswell Fund to pay for the display and care of the Collection at Fisk and denying Fisk's petition for *cy pres* relief. After the contingencies were met, the fund would have a corpus of at least $2,620,000 and would generate $131,000 per year.

The court entered a Memorandum and Order on November 3, 2010, in which it approved the Revised Sharing Agreement, thereby permitting Fisk to sell a fifty percent undivided interest in the Collection to the Crystal Bridges Museum for $30 million; approval was conditioned on Fisk establishing an endowment for the Collection with $20 million of the sale proceeds. The order also allocated $10 million of the proceeds of sale for Fisk to use at its discretion and required court approval of future sales, exchanges, or transfers of the Collection. On November 9, 2010, the court amended the November 3, 2010 order, adding additional findings of fact and reasoning for its approval of Fisk's Revised Sharing Agreement and for its creation of the $20 million endowment.

The Attorney General contends that the trial court erred by exceeding the scope of remand and failing to adhere to the law of the case, and that it abused its discretion in approving the Revised Sharing Agreement. Fisk seeks review of trial court's requirement that it establish the endowment.

STANDARD OF REVIEW

In our earlier opinion, we pointed out that New York law controls the substantive issues in the case, while Tennessee law controls resolution of procedural issues; consequently, we review the trial court's findings of fact *de novo*, accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d). Our review of the trial court's determinations regarding questions of law is *de novo* with no presumption of correctness. *See Staples v. CBL Associates, Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Discretionary decisions are reviewed under the abuse of discretion standard.[5]

---

[5] A thorough discussion of this standard is set forth in *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010) thusly:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal. *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000). It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999). Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998). The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

(continued...)

DISCUSSION

## I. AVAILABILITY OF *CY PRES* RELIEF

As noted in our earlier decision, consideration of a request for *cy pres* relief is a two-step process. *Georgia O'Keeffe Foundation (Museum)*, 312 S.W.3d at 16–17. First, the court must determine if *cy pres* relief is available; if so, the second step requires the court to determine if the proposed modification closely approximates the donor's charitable intent. The first step has three prongs and requires the court to find: (1) that the gift is charitable in nature; (2) that the donor had a general, rather than specific charitable purpose in mind; and (3) that circumstances have changed such as to render compliance with the conditions impracticable. *In re Hummel*, 805 N.Y.S.2d 236 (2005). In the first appeal, we determined

---

[5](...continued)

   Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballar d v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996). An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d at 42.

   To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872–73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87–136–II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524–25 (Tenn. 2010).

the second prong of the first step, *i.e.*, that Ms. O'Keeffe had a general charitable intent.[6] The case was remanded for the court to determine whether it was impracticable to comply with the conditions of the gift and, if so, to fashion relief closely resembling Ms. O'Keeffe's general intent.

In accordance with the order of remand, the court held a trial and determined that, due to Fisk's financial situation, it was impracticable for Fisk to comply with Ms. O'Keeffe's condition that the Collection be maintained at and displayed by Fisk. In making this determination, the trial court relied on the testimony of Fisk's President, Hazel O'Leary, who testified regarding the University's finances and discussed the many cuts that had been implemented in an effort to reduce expenses, such as eliminating educational programming for students, reducing the salary of faculty and staff, and mortgaging buildings on campus. When asked whether Fisk was "viable" in light of its financial challenges, President O'Leary stated, "No, not at all." President O'Leary's testimony in this regard was uncontradicted. An exhibit introduced through the testimony of President O'Leary showed that the annual cost to maintain and display the Collection is $131,000; she testified that this expense was unsustainable for Fisk, in light of its financial challenges. In addition to the testimony of President O'Leary, annual financial statements of Fisk from June 2004 through June 2009 and the financial audit of the University as of June 30, 1950 were introduced.

Although the finding of impracticability has not been appealed by the parties,[7] we have thoroughly reviewed the record and find that the evidence does not preponderate against the court's holding that the financial condition of Fisk renders strict compliance with the conditions attendant to the gift impracticable. Consequently, the court did not err in holding that *cy pres* relief was available.[8]

## II. SCOPE OF REMAND

After determining the threshold issue of impracticability and rejecting the original proposal with the Crystal Bridges Museum in its order of August 20, the court received the Revised Sharing Agreement from Fisk and the Attorney General's proposals and analyzed them to determine the extent to which the proposals approximated Ms. O'Keeffe's intent.

---

[6] The first prong of the test—that the gift is charitable in nature—was not contested.

[7] *Amici curiae* assert that the present financial condition of Fisk does not support application of the *cy pres* doctrine.

[8] *See In re Application of Bd. of Trs. of the Huntington Free Library & Reading Room*, 771 N.Y.S.2d 69, 71 (N.Y. App. Div. 2004) (approving the lower court's finding of impracticability in light of donee's concession that it was not able to meet custodial responsibilities attendant to the gift).

In its Memorandum and Order of November 3, 2010, the trial court approved the Revised Sharing Agreement. In so doing, the court concluded that connecting the Collection to Fisk was a motivating factor in Ms. O'Keeffe's decision to make the gift, that it was a "defining characteristic of the Collection," and that locating the exhibit at Fisk became a part of her "full dispositional design." The Attorney General contends that in reaching these conclusions the trial court erroneously reopened the issue of Ms. O'Keeffe's charitable intent, thereby exceeding the scope of remand. We do not agree that the trial court exceeded the scope of remand or that its holding in this regard was contrary to the law of the case.

N.Y. Est. Powers & Trusts Law § 8-1.1 states in part pertinent to the issues in this appeal:

> (c)(1) . . . whenever it appears to such court that circumstances have so changed since the execution of an instrument making a disposition for religious, charitable, educational or benevolent purposes as to render impracticable or impossible a literal compliance with the terms of such disposition, the court may, on application of the trustee or of the person having custody of the property subject to the disposition and on such notice as the court may direct, make an order or decree directing that such disposition be administered and applied in such manner as in the judgment of the court will most effectively accomplish its general purposes, free from any specific restriction, limitation or direction contained therein; provided, however, that any such order or decree is effective only with the consent of the creator of the disposition if he is living.

Divining a donor's "full dispositional design" is appropriate in applying the statute, which has been characterized as "New York's statutory articulation of *cy pres* and equitable deviation." *Bd. of Trs. of Museum of Am. Indian, Heye Found. v. Bd. of Trs. of the Huntington Free Library and Reading Room*, 610 N.Y.S.2d 488, 494 (N.Y. App. Div. 1994). Evidence of the donor's "full dispositional design" relates to the statutory responsibility of the court to "make an order or decree directing that such disposition be administered and applied in such manner as in the judgement of the court will most effectively accomplish its general purpose. . . ." N.Y. Est. Powers & Trusts Law § 8-1.1(c)(1).

In the earlier appeal, we did not reach the second step in the *cy pres* analysis, *i.e.*, whether the proposed modification closely approximated the donor's charitable intent. The importance of discerning a donor's "full dispositional design" in the second step of the analysis was articulated as follows:

[W]hile a court in the exercise of the cy pres power may disregard specifically prescriptions, limitations or directions respecting the way in which the dispositional purposes are to be achieved [ ], *it may do so only insofar as such variance facilitates or is at least compatible with the realization of the full dispositional design.*

*Heye Found.*, 610 N.Y.S.2d at 499 (emphasis added). The trial court's analysis and finding of Ms. O'Keeffe's full dispositional design in the second step of the analysis was in furtherance of the court's responsibility to apply § 8-1.1(c)(1) and is not inconsistent with, or violative of, the earlier holding that Ms. O'Keeffe had a general charitable intent. The trial court did not deviate from the order of remand in making these additional findings.

## III. DISPOSITIONAL DESIGN

Having determined that Georgia O'Keeffe's full dispositional design was a proper scope of inquiry for the court, we address the court's findings in that regard.

In making the gift to Fisk, Ms. O'Keeffe implemented two provisions of Mr. Stieglitz's will, one of which allowed Ms. O'Keeffe to transfer all of Mr. Stieglitz's art during her lifetime and the other requiring the recipient to hold the art "under such arrangements as will assure to the public, under reasonable regulations, access thereto to promote the study of art." The gift to Fisk was accompanied by various conditions, including a prohibition on sale of any of the objects in the Collection. Other conditions, set forth in correspondence from Ms. O'Keeffe to Fisk's President Charles Johnson, reflected Ms. O'Keeffe's condition that the Collection be kept intact and her concerns relating to maintaining the particular works comprising the Collection. *See Georgia O'Keeffe Foundation (Museum)*, 312 S.W.3d at 6–7.

As noted by the trial court, at the time of the gift, the South was segregated by race and locating the Collection at Fisk was unique. Despite the *de jure* racial segregation existing in the 1940s and 1950s, whites visited on the Fisk campus for various cultural and intellectual pursuits. *See* Marybeth Gasman and Edward Epstein, *Modern Art in the Old South: The Role of the Arts in Fisk University's Larger Curriculum*, 31 EDUC. RESEARCHER 13 (March 2002).[9] The selection of Fisk was also unique in that, while five of the six

---

[9] Clearly, Fisk University, through its gallery and programs was exposing students and faculty from all over the South to modern art and, thus, was one of the most significant cultural venues in the area. But more importantly, the gallery and the various other cultural institutions at Fisk,

(continued...)

recipients of the entire Stieglitz collection were museums, Fisk was the only university. Consistent with the fact that Fisk did not have the resources generally available to a museum, correspondence between Ms. O'Keeffe and President Johnson after the gift was completed showed continuing efforts on the part of Ms. O'Keeffe's to ensure that the Collection had appropriate facilities and was being properly maintained. By locating the Collection at Fisk, Ms. O'Keeffe was also able to fulfill Mr. Stieglitz's second instruction by allowing the public living in the South to view and study modern art, which was denominated "this new art." *Id*. at 13.[10]

In making gifts of the entire Stieglitz artwork to various institutions, Ms. O'Keeffe exercised a general charitable intent; she made the conscious decision that exposure to the Collection in the South would be at Fisk. There is no doubt that placing the art at Fisk was a strong social statement and integral to Ms. O'Keeffe's general intent to expose Nashville and the South to the art. The trial court's finding that the art would not be in Nashville, or the South, but for Fisk is fully supported by the evidence. We affirm the court's holding that a secondary consideration and motivating factor in Ms. O'Keeffe's dispositional design was the placement of the Collection at Fisk; the trial court properly considered this factor in its *cy pres* determination.

IV. THE FINDING THAT THE AGREEMENT WITH THE CRYSTAL BRIDGES MUSEUM MOST CLOSELY RESEMBLED MS. O'KEEFFE'S INTENT

In the earlier appeal, we instructed the trial court that, "[i]f *cy pres* relief is available to the University, then the trial court is to fashion a form of relief that most closely approximates Ms. O'Keeffe's charitable intent." After determining that *cy pres* relief was available, the trial court solicited proposals from the parties to aid the court in fashioning an appropriate remedy. In the November 3, 2010 Memorandum and Order, the trial court discussed the competing proposals and examined each in light of Ms. O'Keeffe's full dispositional design. The court found that Fisk's revised proposal not only more closely approximated Ms. O'Keeffe's charitable intent, but that it also "greatly enhances Ms.

---

[9](...continued)
> . . . became meeting points for Blacks and Whites within the then - segregated South.

Gasman and Epstein, *supra*, at 17.

[10] "[Ms. O'Keeffe] obviously felt it important to expose southern audiences to modern art and she wanted to do so in an institution that would serve both Blacks and Whites." Gasman and Epstein, *supra*, at 13.

O'Keeffe's purpose that the public be given access to the Collection to promote the study of art."

In reviewing the trial court's decision, we are mindful that "the application of the *cy pres* doctrine involves a great measure of judicial discretion." *In re Bd. of Trs. of Huntington Free Library & Reading Room*, 771 N.Y.S.2d 69, 71 (N.Y. App. Div. 2004) (citing *Sherman v. Richmond Hose Co. No. 2*, 230 N.Y. 462, 473 (1921)). The trial court's determination that Fisk's revised proposal was the form of *cy pres* relief that most closely approximates Ms. O'Keeffe's intent required the court to choose among several possible alternatives. Thus, the decision to adopt Fisk's proposal was a discretionary one which we will review under the abuse of discretion standard. In utilizing this standard we review the evidence in the light most favorable to the decision. *Gonsewski v. Gonsewski*, M2009-00894-SC-R11CV, 2011 WL 4116654 at \*3 (Tenn. Sept. 16, 2011) (citing *Wright,* 337 S.W.3d at 176; *Henderson,* 318 S.W.3d at 335). We consider the proposals and the trial court's reasoning for accepting or rejecting them in turn.

The Attorney General's first proposal, submitted September 10, 2010, provided that the Frist Center would take custody of the Collection and display the art in gallery space devoted solely to the Collection until Fisk was financially able to resume its role as caretaker of the art. By Order entered September 14, the court rejected this proposal, holding, *inter alia*, that it did not provide a long-term solution to keep the Collection in Nashville full-time as the proposal was "merely hypothetical at this point."

The second proposal of the Attorney General involved an endowment to be funded by donations from individuals, organizations, and corporations which would produce income sufficient to pay Fisk's annual costs of displaying and maintaining the Collection and which would be administered by The Community Foundation. Donations to the fund were contingent "upon a final, non-appealable order being entered in this matter approving the use of the Pearl Creswell Fund to pay for the full-time display and care of the Collection in the Van Vechten Gallery at Fisk and denying Fisk's petition for *cy pres* relief." The court declined to adopt this proposal stating:

> [A]dopting either of the proposals of the Attorney General would unnecessarily frustrate the unique dispositional design of Ms. O'Keeffe's charitable gift. The Attorney General's proposals only take into account half of the problem in this case. The deficiency with the proposals of the Attorney General is that they provide no money for Fisk, the institution. Both of the Attorney General's proposals fail to account for Ms. O'Keeffe's design that locating the Stieglitz Collection at Fisk University was important in her decision to bring the collection to Nashville.

Next, the trial court examined the Revised Sharing Agreement and determined that it most closely approximated Ms. O'Keeffe's charitable intent. The court identified two key elements that informed its decision to accept Fisk's proposal: "(1) the superior resources of the Crystal Bridges Museum to provide this important Collection excellent support and access to the public, and (2) Fisk and Crystal Bridges have modified their agreements to assure that the Collection retains a presence in Nashville." Moreover, the court found the proposal enhanced Ms. O'Keeffe's purpose of sharing the Collection with Nashville and the South.

The Attorney General contends that the trial court rejected both of the Attorney General's proposals because neither provided money to Fisk and argues that the Revised Sharing Agreement fails to most closely approximate Ms. O'Keeffe's charitable intent because, *inter alia*, it allows for the sale of an interest in the Collection, contrary to the no-sale condition.

As an initial matter, the Attorney General's proposals were not rejected on the sole basis that they did not provide money for Fisk. In determining which proposal most closely approximated Ms. O'Keeffe's dispositional design, the court considered a number of factors, including the extent to which the proposal benefitted Fisk financially. The language in the November 3 Memorandum cited by the Attorney General, wherein the court stated that the Attorney General's proposals were deficient "because they provide no money for Fisk," was in the context of the court's holding that those proposals did not adhere to Ms. O'Keeffe's full dispositional design. While the question of whether Ms. O'Keeffe intended to financially benefit Fisk was germane in determining whether either proposal accomplished the general purpose of the gift, *see* N.Y. Est. Powers & Trusts Law § 8-1.1(c)(1), a finding that Ms. O'Keeffe had a specific intent to financially benefit Fisk was not a prerequisite for approval or cause for rejection of any proposal and we do not construe the trial court's language in the manner suggested.[11]

---

[11] As noted in our earlier opinion:

> We acknowledge the fact that Ms. O'Keeffe had a specific *purpose* in mind and that she imposed specific *conditions* on the gifts, but a specific purpose and the imposition of specific conditions does not mean that the gifts were motivated by a specific *intent*, as that term is applied in a *cy pres* analysis. *See, e.g., In re Estate of Othmer*, 815 N.Y.S.2d at 447. Thus, the fact that Ms. O'Keeffe had a specific purpose and imposed specific conditions does not alter the fact that the motivation for the gifts to the University was to promote the study of art in Nashville and the South.

*Georgia O'Keeffe Foundation (Museum)*, 312 S.W.3d at 18.

The purpose of the arrangement between Fisk and Crystal Bridges Museum, stated in the Amended and Restated Joint Ownership Agreement, is as follows:

The purpose and overarching principle of this Agreement is to advance the educational purpose of the Collection and in service of that purpose (a) to provide access to the Collection for study and public appreciation; (b) to preserve, protect and promote the integrity and well-being of the Collection; (c) to advance the importance, study and understanding of the Collection; (d) to safeguard and expand the artistic legacy of the artists whose works are included in the Collection; (e) to generally serve the best interests of the Collection and (f) to enable the public in Nashville and the South to have an opportunity to study the Collection in order to promote the general study of art.

To address Ms. O'Keeffe's condition that the Collection be displayed intact, the Revised Sharing Agreement provides that the Collection will be displayed at the institutions on a rotating basis so that it will be available on the Fisk campus during at least two years of each student's four year matriculation at Fisk. With respect to the maintenance and display conditions, the agreement establishes a "Collection Committee"[12] and charges that committee, when determining what is in the best interest of the Collection, to "take into account the conditions originally set out by Georgia O'Keeffe . . . ." In accordance with the original conditions, no item of work included in the Collection may be sold or exchanged, no item of work may be added to the Collection, and the Collection will be known, in perpetuity, as the "Alfred Stieglitz Collection." Not only will the artwork be displayed in accordance with Ms. O'Keeffe's original conditions, it will be displayed in accordance with the "best art museum industry practices . . . and with general adherence to the American Association of Museums (the "AAM") guidelines . . . ." In addition, the Court's November

---

[12] The Collection Committee will be composed of the following five members:

(i) the person who is serving as chief curator of Crystal Bridges;
(ii) the person who is serving as chief curator (or museum director) of the Fisk University Galleries;
(iii) a conservator versed in the diverse media of the Collection, proposed by Crystal Bridges after consulting with Fisk, and approved by Fisk and Crystal Bridges;
(iv) a noted scholar on American Modernism, proposed by Crystal Bridges after consulting with Fisk, and approved by Fisk and Crystal Bridges; and
(v) a person with significant experience in the art museum industry, proposed by Crystal Bridges after consulting with Fisk, and approved by Fisk and Crystal Bridges.

3 order makes any further sale, exchange or transfer by either Fisk or the Bridges Museum subject to court approval.

The Revised Sharing Agreement is comprehensive and detailed; the arrangement with the Bridges Museum gives Fisk access to the resources of a museum to support its responsibilities relative to the Collection as well as its educational mission to expose students and the South to the Collection. While each proposal reflected, in some measure, Ms. O'Keeffe's charitable intent, the holding that the Revised Sharing Agreement most closely approximated her intent is supported by the evidence. The court did not err in its application of the appropriate legal principles, and did not abuse its discretion in modifying the no-sale condition and approving the Revised Sharing Agreement.

## V.  THE IMPOSITION OF CONDITIONS ON FISK'S USE OF FUNDS

In the November 3, 2010 Memorandum and Order, the court held that the modifications to the Revised Sharing Agreements satisfied objections the court had put forth in the August 20 and September 14 orders and stated that the court was "ready to modify the no-sale condition of the gift and approve the Revised Sharing Agreements." Finding that none of the proceeds of sale were designated by Fisk for the Collection and that Fisk did not state specific plans for the distribution of the $30 million proceeds of sale, the trial court required Fisk to establish an endowment of $20 million from the proceeds as a condition of its approval of the Revised Sharing Agreements. The court ordered Fisk to use the income from the fund, which the court estimated to be $1 million annually, "to pay [its] obligations under the . . . Revised Sharing Agreements; to maintain the Van Vechten Gallery and its attendant needs such as security, staff, parking, etc.; and to fulfill its mission of providing the Nashville public access to the Collection and promoting the study of art." The court allowed Fisk to use the remainder of the funds generated under the Revised Sharing Agreement in its discretion.

Fisk contends that the court abused its discretion when it conditioned its approval of the agreements on the requirement that Fisk establish the $20 million endowment. Fisk also asserts that the court abused its discretion when, based on the court's conclusion that $10 million would solve Fisk's financial problems and the court's concern regarding "monetization" of the Collection, the court limited the amount of the sale proceeds that Fisk would have to use at its discretion to $10 million.

### A.  Creation of the Endowment

In construing and applying N.Y. Est. Powers & Trusts Law § 8-1.1(c)(1), the trial court is vested with "a great measure of judicial discretion." *In re Huntington*, 771 N.Y.S.2d

at 71. The statute is to be construed and applied "to prevent the failure of a charitable disposition while there remains a general purpose of disposition possible of accomplishment." *Id.* at 75. The court's discretion is to be exercised to reach a disposition that "will most effectively accomplish [the gift's] general purposes." N.Y. Est. Powers & Trusts Law § 8-1.1(c)(1). We apply the abuse of discretion standard in our review. *Lee Med.*, 312 S.W.3d at 515.[13]

With regard to the requirement that Fisk establish an endowment for the art, the court stated:

> The reason the Court has included as part of its plan a requirement that Fisk use $20 million of the sale proceeds for an endowment is to secure the Collection, independent of Fisk, and to assure that the Collection stays in Nashville the full 50% of the time retained under the Crystal Bridges Revised Sharing Agreements. This aspect of the order is in keeping with the O'Keeffe intent of providing Nashvillians access to the Collection.

Although the court did not make specific findings of fact with reference to the endowment requirement, the court stated:

> During the August 2010 trial, Exhibit 207 was introduced into evidence. It established that the cost of Fisk using the "Best Practices" with respect to the Collection would require about $1.3 million a year. The income from the endowment, then, will be adequate for Fisk to fulfill its obligations to the Collection.[14]

Exhibit 207 is a chart created by Fisk in response to an interrogatory requesting that Fisk "identify . . . what Fisk would need (i.e., money, including how much is necessary; altered display schedule; altered art maintenance requirement; etc) to address each of the

---

[13] We review the trial court's exercise of discretion to determine: (1) whether the factual basis is properly supported by the evidence in the record; (2) whether the trial court properly identified and applied the most appropriate legal principles applicable to the decision; and (3) whether the decision was within the range of acceptable alternative decisions. *Lee Med.*, 312 S.W.3d at 515 (citing *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872–73 (Tenn. Ct. App. 2008)).

[14] Similarly, in the November 9, 2010 Memorandum and Order the court explained that "[r]equiring Fisk to use the $1 million or less annual endowment income in accordance with trial exhibit 207 will enable Fisk to meaningfully share the Collection with its students, Nashville and the South as intended by Ms. O'Keeffe."

respective reasons compliance is impracticable or impossible listed in Interrogatory ___." The chart contains columns identified on the exhibit as "Best Practices Costs" and "Fisk Actual Expenses" in which specific annual expenses of operating the gallery were itemized. The costs listed in the "Best Practices Costs" column totaled over $5 million; counsel stipulated that recurring costs in this column were $1,380,054. The total in the "Fisk Actual Expenses" column is $131,160.[15]

In testimony regarding Exhibit 207, and how it was compiled, President O'Leary referred to the "Best Practices Costs" column as "the wish list" and stated:

> Q. Does this represent the galleries' staff answer to the interrogatory the attorney general posed? Does this represent the galleries' staff thoughts on the amount of money required to comply with the conditions?
> A. I do not believe so. I believe it is just as I have represented it, an effort on the part of the staff to list a list of things that they would like to have provided for in the gallery.

She also testified that "there's no budget approved nor any contemplation" relative to the "Best Practices Costs" and that the "Fisk Actual Expenses" column is "what Fisk actually does."

The exhibit and the testimony relative to it do not support a finding that $1 million per year is required for Fisk to maintain and display the art in accordance with Ms. O'Keeffe's conditions. Exhibit 207 identifies costs that clearly go beyond compliance with the conditions of the gift; indeed, the trial court found that Exhibit 207 is a "wish list" which would "provide support and promotion of the Collection in the nature of education and

---

[15] A summary of Exhibit 207, showing the cost items and their amount is appended to this opinion. Other items on Exhibit 207, not shown on the appended summary, relate to display timelines and maintenance schedules and have no monetary figure.

outreach beyond the minimum $131,000 required as basic maintenance for the Collection."[16]

Counsel did not identify in their stipulation the items which constituted recurring costs, thereby making a determination of what costs were actually necessary to comply with Ms. O'Keeffe's conditions difficult.[17] There was no explanation of the difference between the $131,000 President O'Leary testified as being the annual cost to maintain and display the collection, which served as the basis of the court's finding of impracticability, and the $1.3 million stipulated as recurring "Best Practices Costs." Moreover, the exhibit reflects costs in both the "Best Practices Costs" and "Fisk Actual Expenses" columns which were determined without consideration of the effect of the approval of the Revised Sharing Agreement—with the attendant responsibilities assumed by the Bridges Museum and the Collection Committee—on the costs necessary to comply with Ms. O'Keeffe's conditions. In addition, it does not appear that the court considered the effect of Ms. Alice Walton's pledge to Fisk of $1 million, the proceeds of which are to be devoted to develop and implement a plan to update and renovate the Van Vechten Gallery and to establish an endowment fund for the maintenance of the gallery, on the cost of Fisk's continuing obligations.

The larger question is whether and to what extent the court could *sua sponte* mandate that Fisk establish an endowment as part of the court's approval of the application for *cy pres* relief. This is a unique issue and precedent is scarce. Creation of an endowment for the Collection was not a condition of Ms. O'Keeffe's or of Fisk's acceptance of the gift and there is nothing in the correspondence between Ms. O'Keeffe and the various Fisk officials to indicate that an endowment was ever contemplated. In addition, although exposure to the art for Fisk students, Nashville, and the South was a purpose of the gift, there were no conditions specifically addressing how the Collection would be utilized in conjunction with

---

[16] The November 9 Memorandum notes:

> What Fisk's curator would like to do with the Collection, if Fisk had the funds, was established through trial exhibit 207 and the testimony of President O'Leary. The Court finds that exhibit 207 is a "wish list" prepared by Fisk. Trial exhibit 207 is a plan to add student guides ("docents") and staffing for the guides; a curator of education for Fisk students, visitors to Fisk and outreach to educate Nashville and the region about the Collection; grant writers; membership services; graphic and exhibition designers; student guide education training for ten guides biannually as a summer program; resources such as computers and printers; and dedicated fundraising opportunities.

[17] For instance, while the utilities and gallery maintenance entry in the "Best Practices Costs" column is $200,000 per year, President O'Leary testified that these cost items are "maintained and [are] part of Fisk's maintenance budget," and it is not clear what the costs of maintenance and display will be to Fisk during the years that the Collection is on display at the Bridges Museum.

-16-

the educational program of the University. N.Y. Est. Powers & Trusts Law § 8-1.1(c)(1) only grants the court the authority to modify the terms of a gift in order to prevent the gift from failing and to accomplish its general purpose. *Heye Found.*, 610 N.Y.S.2d at 499.[18] The court's primary role is to approve or disapprove a particular proposal or determine an alternative to the testator's or grantor's disposition. Any deviation from the original dispositional plan must be pursuant to a plan that is "sufficiently detailed to provide the necessary assurance that the original dispositional design will be, to the extent practicable, effectively carried forward." *Id.*; *see In re Estate of Wilson*, 451 N.Y.S.2d 891, 894 (1982) ("Both statutory mandate and controlling case law require that any modification of the terms of the trust must result in provisions which most closely approximate the expressed intent of the testator.").

The court explained its rationale for requiring the endowment as follows:

The concept of the endowment is twofold. As to income generated from the investment and the endowment, it assures that Fisk can always fulfill its obligations under the Crystal Bridges Revised Sharing Agreements and to the Collection. That in turn assures that the Collection stays in Nashville 50% of the time. As to preserving the corpus of the $20 million in the form of endowment, the purpose is to make sure the 50% "Nashville" interest, retained under the Revised Sharing Agreements, is financially secure, independent of Fisk's financial fortunes.

In the November 9 memorandum the court elaborated on its reasoning for requiring the endowment and restricting the use of funds generated from the endowment and identified three reasons: to fund the expenses outlined in Exhibit 207; to ensure that Fisk did not breach or default on its monetary obligations under the Revised Sharing Agreement; and to "further separate[] the Collection and the endowment from Fisk, the institution, if Fisk is placed into bankruptcy."

Although it was appropriate for the court to consider the extent to which Ms. O'Keeffe's dispositional design would be carried forward in the future, the court exceeded its statutory authority to free the gift "from [a] specific restriction, limitation or direction" when it decreed how the proceeds of sale would be spent and the manner in which the funds would be accounted. The practical effect of the court's ruling was to require Fisk to implement the elements of the Exhibit 207 "wish list" and to interfere with Fisk's operational

---

[18] "Consideration of the relative efficacy of alternative dispositional plans is appropriate only after the threshold finding or impracticability or impossibility has been made and only then within the limitations prescribed by the statute." *Id.* at 499.

lines of authority and prerogatives as an institution of higher education to design and manage its educational program, deploy its assets, and utilize its employees. After the no-sale condition was lifted, the remaining conditions related to maintenance and display of the art; while the expenditures in Exhibit 207 may be desirable, they were not necessary to comply with the conditions of the gift. The court has no authority under the statute and the facts of this case to effectively decree the manner by which the Collection would be used by Fisk in furtherance of its educational mission.

Similarly, there is no authority for the court to require that the "50% 'Nashville' interest, retained under the Revised Sharing Agreements" be "financially secure, independent of Fisk's financial fortunes." We do not agree with the court's statement that the possibility of Fisk being placed into bankruptcy by a creditor "had to be considered by the court in formulating a plan for the Collection." Unlike the broad powers available to a court of chancery in exercising traditional equitable jurisdiction, the court's authority in decreeing *cy pres* relief is restricted. The only consideration before the court was whether additional modifications to the conditions imposed on the gift were necessary to accomplish its purposes; that authority does not extend to decreeing that the Collection must be treated separately from other university assets.

Accordingly, we reverse the requirement that Fisk establish a $20 million endowment for the Collection and remand the case for reconsideration of whether, in light of the approval of the Revised Sharing Agreement, further measures are necessary to accomplish the purposes of the gift. As part of the reconsideration, the court and the parties should consider the effect of the court's approval of the Revised Sharing Agreement as well as the results to be achieved by the implementation of the renovation plan and endowment contemplated by the Alice Walton pledge of $1 million on the continuing obligations of Fisk to comply with the conditions imposed by Ms. O'Keeffe, and to allow Fisk the opportunity to set forth how those obligations will be met in the future.[19] In holding that, under the facts of this case, the court's authority does not extend to requiring an endowment, we do not preclude the court from approving an endowment or other dedicated source of support in the event such a proposal is presented.

B. Order Relative to the Proceeds of Sale

With respect to the court's holding that Fisk could have access to only $10 million of the sale proceeds, the court explained:

---

[19] In its discussion, the court noted that Fisk "states no specific plans for the distribution of the $30 million."

The Court's order provides that $10 million of the sale proceeds shall be paid to Fisk for it to spend at its discretion. This provision of the order derives from the proof Fisk provided during the August 20 trial on its financial condition. . . . that financial condition includes that Fisk has zero dollars in unrestricted endowment, all of its buildings are mortgaged, its bills total $2 million, it runs a $2 million deficit annually, and its endowment totals only $3.7 million. The $10 million will enable Fisk to address its immediate debt and, with that clearance, plan how the University shall secure its future.

In light of our reversal of the court's requirement that Fisk establish an endowment with $20 million of the sale proceeds and remand for further consideration, we reverse the court's order that limits the availability of funds to Fisk to $10 million.

CONCLUSION

For the foregoing reasons, we affirm the trial court's approval of the Revised Sharing Agreement. We reverse the order requiring Fisk to establish an endowment of $20 million from the proceeds of sale and limiting the funds available to Fisk from the proceeds to $10 million. The case is remanded for further proceedings in accordance with this opinion.

_____
RICHARD H. DINKINS, JUDGE

-19-

| Items | Best Practices Costs | Fisk Actual Expenses |
|---|---|---|
| Stieglitz Collection | | |
| Prohibits proper conservation of objects. Should be shown on rotation schedule | | 0.00 |
| Conservation: (budget to cover possible issues with works in various media: paper, paintings, photographs, sculpture, etc.) Conservation specialist needed for works in various media for Stieglitz Collection<br>Paper Conservator<br>Painting Conservator<br>Photographs Conservator<br>African Artifacts Conservator | $20,000.00/yr | TBD |
| Additional Storage space for objects – works on paper, paintings, when not being exhibited | $10,000.00 | 0.00 |
| Acid Free-Archival Storage Boxes for works on paper | $5,000.00 | 0.00 |
| HVAC & Fire Prevention Systems | See Below | |
| **Other Costs** | | |
| Salaries (Includes 28% fringes) | N/A | N/A |
| Director of Museum | $108,800 | $85,000 |
| Administrative Assistant to the Director | $44,800 | $35,840 |
| Curator of American & European Art | $83,200 | 0.00 |
| Associate Curator of African/Tribal Art | $64,000 | 0.00 |
| Associate Curator of Decorative Arts | $64,000 | 0.00 |
| Associate Curator Prints, Drawings & Photographs | $44,800 | 0.00 |
| Curator of Education | $64,000 | 0.00 |
| Associate Curator of Education | $58,411 | 0.00 |

| Items | Best Practices Costs | Fisk Actual Expenses |
| --- | --- | --- |
| Docent Co-ordinator | $32,000 | 0.00 |
| Collection Registrar | $57,600 | 0.00 |
| Collection Preparator | $44,800 | 0.00 |
| Associate Preparator | $34,560 | 0.00 |
| Art Handlers | $34,560 | 0.00 |
| Security Personnel | $26,600 | 0.00 |
| Conservator/Conservation Consultant | $64,000 | 0.00 |
| Administrative Assistant | $32,000 | 0.00 |
| Graphic/Exhibitions Designer | $51,200 | 0.00 |
| Grant Writer | $51,200 | 0.00 |
| Editor / Publicist | $64,000 | 0.00 |
| Membership Services Manager | $60,160 | 0.00 |
| Facility Needs (100/sq. ft. @ $290/ sq. ft.) | $290,000.00 | 0.00 |
| Staff Office Space (14 Offices, average size 22' x 27') | $830,000.00 | xxx |
| Art Conservation Lab (2 Rooms, 30' x 45') | $130,000.00 | 0.00 |
| Classroom spaces (2 Spaces, 30' x 30') | $90,000.00 | |
| Art Storage (Expanding Rack storage shelves for 3D objects) (40' x 65') | $260,000.00 | 0.00 |
| Exhibition prep work space (45' x 65') | $295,500.00 | xxx |
| Personal Computers (20 @ $2500 ea.) | $50,000.00 | $7,500.00 |
| Photocopy machines (2) | $4000.00 | 0.00 |
| **Office Supplies (paper, stationery, print inks, etc.)** | | |
| Publication quality laser printers (2) @ $800 ea. | $1600.00 | 0.00 |
| Office Furniture (desk, chairs, etc.) | $40,000.00 | xxx |

| Items | Best Practices Costs | Fisk Actual Expenses |
|---|---|---|
| Personal laser printers (5) @ $180 ea. | $900.00 | 0.00 |
| Record Storage (file cabinets) 25 (2-drawer) @ $100 ea. | $2,500.00 | $300.00 |
| Record Storage (file cabinets) 15 (4-drawer) @ $600 ea. | $9,000.00 | $2400.00 |
| Utility service carts 6 @ $120 ea. | $720.00 | $120.00 |
| **Art Installation & Conservation Materials** | | |
| Lab Equipment (Conservation lab, sinks, easels, luminaries, UV lanterns, spotting tables, suction tables, washing equipment, etc.) | $25,000.00 | 0.00 |
| Art transport vehicle (delivery van, small moving truck with covered storage) | $30,000.00 | 0.00 |
| Research library (35' x 40') | $140,000.00 | 0.00 |
| Exhibition galleries (5 - average size: 110' x 130') | $1,430,000.00 | |
| Stieglitz Collection Catalogue (Color Reproductions, Complete Collection) | $30,000.00 | 0.00 |
| Docent Education / Training Course (Course held bi-annually during Summer semester (10 docents) | $10,000.00 / yr. | |
| Exhibition Signage 1 Didactic signage (32" x 40" silk screened board) 8 Medium Artists bio labels (17"H x 11"W) 101 Wall labels (3" H x 5" W) | $850.00 | 0.00 |
| Utilities | $65,362.77 / yr. | |
| Gallery Maintenance  Lighting  Painting  Floors  HAV (Heating, Air and Ventilation) | $200,000.00 / yr. | TBD |

| | | |
|---|---|---|
| Structural (Roof Facades, Windows, etc.)<br>Plumbing<br>Electrical<br>Grounds | | |